**THE ANITA D.**
**LOUISIANA MATERIALS CO., Inc., v.**
**SICK.**

No. 154.

District Court, E. D. Louisiana.

Aug. 4, 1939.

Terriberry, Young, Rault & Carroll, of New Orleans, La. (Walter Carroll, of New Orleans, La., of counsel), for libelant.

John D., M. A., & Edwin H. Grace, of New Orleans, La. (Matthew A. Grace, of New Orleans, La., of counsel), for respondent.

BORAH, District Judge.

The Louisiana Materials Company as bailee of certain barges filed this libel on July 9, 1934, against the tug Anita D. and George Sick, the owner thereof, to recover damages alleged to have been sustained to the barges as the result of negligent towage. The libel alleges that the grounding of said barges and the losses and damages resulting therefrom were caused solely through the negligence of the tug and of George Sick, her master and owner, (1) in that the tug Anita D. did not have a competent master on board; (2) in not taking refuge with said barges. in a safe harbor; (3) in improperly and insecurely anchoring said barges in an improper and dangerous place; (4) in abandoning said barges under adverse weather conditions, and in a dangerous and improper place; (5) in failing to notify libelant or any other person of the position of the barges and the circumstances of their anchorage. At the trial it was conceded in argument that libelant had failed to sustain the burden of proving the first four allegations of negligence, consequently the issues have been narrowed to that extent. The respondent by way of answer denied that he or his tug were in any way responsible for any damage to said barges and filed a cross-libel against libelant to recover the agreed compensation for the use of the tug and the value of certain ropes and lanterns which were alleged to have been lost during said service. Having stated the issues, the Court in compliance with Admiralty Rule 46½, 28 U.S.C.A. following section 723, now makes the following findings of fact:

On April 11, 1934, the tug Anita D. was proceeding from Schroder, Louisiana, to the London Avenue Canal, New Orleans, in tow of three steel barges on hawsers. Two of the barges were fully loaded with gravel and the third with certain machinery. The tugboat Anita D., owned and operated by George Sick, operating as the Sick Transportation Company, had been chartered to the Louisiana Materials Co.,

Inc., for $50 a day, the tug to furnish the crew and fuel. At 8:30 P. M., when about three-quarters of the way across the Lake, the barometer began falling rapidly and at 9:45 P. M. strong northwest winds began blowing. At about 10.15 P. M. the tug and tow were about one mile off the entrance to the London Avenue Canal. At this time there was a very strong northwest wind blowing and heavy rain with high seas.

As the wind was increasing in velocity the master of the tug Anita D. decided to anchor the barges, which were not equipped with anchors or ground tackle, rather than to attempt to make an entrance into the London Avenue Canal or into West End, as such an undertaking, in his opinion would have been very dangerous if not impossible. Accordingly, at about 10:15 P. M. the barges were anchored about a mile off the entrance to the London Avenue Canal. In anchoring the barges the tug master fastened the tug's 300 or 350 pound anchor on the towline of the barges and after towing them into position cast the anchor overboard; after which anchor lights were placed on the barges and the couplings and anchor cable were examined. Thereupon, because of the high seas and the strong winds and because she had used all her equipment on the barges, the tug Anita D., after first circling the barges to see if they were in proper condition, proceeded into the New Basin Canal where she tied up just inside the canal entrance at 11:25 P. M.

The barges were in a very dangerous position because of the high seas and strong winds. The weather at that time was as bad as the master of the Anita D. or any one aboard that tug had ever experienced, and it was obvious to them and to any one having experience on Lake Pontchartrain that the barges could not be held by one anchor of the size mentioned, and that they would inevitably drag the anchor and land on the beach. The three barges with their cargoes were worth about $45,000.

After the Anita D. had safely tied up in the New Basin Canal at West End the master of the tug endeavored to notify libelant of the position of the barges and the circumstances of their mooring. He walked over to the light house and found it closed; he went to the Texas Oil station and it was closed; he went to other stands and places at West End but found no telephone; he went to the traffic bridge and spoke to the bridge tender who told him his telephone was out of order; he visited a yacht and inquired from a friend if there were any phones in the neighborhood that were available at that time of night and upon receiving a negative answer made no further efforts and retired for the night. Captain Sick knew that Stevens, the president of Louisiana Materials Company, had a telephone at his residence as he had had occasion to communicate with him before. However, there is no evidence in this record to show that he knew where Stevens lived, and the fact that he could have walked there in one-half hour is thoroughly consistent with the view that he had no such knowledge.

Stevens was at home throughout the night of April 11th and 12th, and had notice of the barges' predicament been communicated to him promptly there is no assurance that a tug could have been sent out in time to assist the barges. Pretermitting weather conditions, the tug Bobby Williams was in the Industrial Canal with the necessary equipment at hand and with a full crew aboard could have made ready and gone out to the rescue of the barges within one hour after notice was received. The tug carried a double crew but only one master. The master did not recall whether he slept aboard the tug that night or not and he had no telephone. With respect to the remaining members of the crew the evidence shows that unless the tug was engaged in performing some character of night service there would be no necessity for any of the members of the crew sleeping on the tug when she was in the Industrial Canal. The testimony in this case further shows that on the night in question the bridge over the Industrial Canal closed at 10:00 P. M. and did not open until 6:00 A. M. the following morning. While it is true that libelant had on several occasions made arrangements with the Dock Board to keep the bridge open an hour or two after closing hours no such request was made in this instance. Furthermore the record fails to show a single instance where at any time after the bridge had once closed for the night, that arrangements had been made to have the bridge opened prior to 6:00 A. M. Therefore, there is nothing before the Court to show what procedure libelant at this hour of the night would have been required to go through in order to secure the neces-

sary permit to open the bridge, if obtainable, or as to how many hours would elapse before this could be accomplished if at all.

Between the time the tug Anita D. left the barges at anchor off the London Avenue Canal until she reached West End at least forty minutes elapsed. Sick's efforts to secure the use of a telephone must have consumed at least another half hour, and it would have taken him this long to walk to Stevens' house if he knew its location. Assuming that within a half hour libelant was notified as to the position of the barges and assuming that the tug Bobby Williams had a full crew aboard and was immediately notified to proceed, at least two hours and ten minutes would elapse before the tug could get under way. When the tug Bobby Williams went out the Industrial Canal on the afternoon of April 12th it took her, under more favorable weather conditions, a half hour to reach the barges. Therefore taking the shortest period of time as shown by the record, it is apparent that two hours and forty minutes would have elapsed between the time the barges were left at anchor until help could have reached them. Where the barges were at this time no one has undertaken to say though no one disputes the fact that the barges were bound to drag anchor.

At 5:30 A. M. on April 12th the president of libelant company arrived at the scene and found the three barges aground at the entrance of the London Avenue Canal. Libelant immediately undertook the task of pulling the barges into the canal by means of a tractor. Operations with respect to the barge on which the machinery was loaded were successful. This was the barge nearest shore that was drawing only 2¼ feet of water. The heavily laden gravel barges had a draft of about 6 feet. These operations consumed considerable time and a tug was not sent to the assistance of the barges until that afternoon at 2:30 P. M., and this was due to the fact that it was not until noon of that day that the weather commenced to moderate.

From the foregoing findings of fact the Court concludes as a matter of law that this being a suit based on negligent towage, an action ex delicto, the burden is on libelant to prove the respondent's negligence, and that a presumption of negligence does not arise merely from a showing that the tow has been damaged. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Ashwaubemie, 4 Cir., 3 F. 2d 782; New Orleans Coal & Bisso Towboat Company et al. v. United States et al., 5 Cir., 86 F.2d 53.

The tug is neither a bailee nor an insurer of the tow, nor liable as a common carrier. The tug is obliged to use only reasonable and ordinary skill and care, and the burden of proving a lack of it is on the one who asserts it.

After a careful consideration of the record I am persuaded that the burden of proving negligence on the part of respondent has not been sustained by libelant, and that the libel filed herein should be dismissed at libelant's cost.

Even if it be assumed that respondent was guilty of negligence in failing to promptly notify libelant of the position of the barges and the circumstances of their mooring, libelant has not carried the burden of proving that had the notice been promptly given, help could have reached the barges before they actually went aground. There is no evidence before the Court as to the time the barges dragged ashore, whether before or after the time within which it is claimed help could have reached them; consequently if the notice had been promptly given the question as to whether or not the barges could have been saved from grounding and consequent injury is in the realm of conjecture. Assuming, therefore, that the negligence of respondent is established, the libelant has still failed to carry the burden of proving that such negligence was the proximate cause of the injury to the barges. Indeed the circumstances clearly indicate that this alleged negligence on the part of respondent was not the proximate cause of the injury.

I find from the evidence that respondent and cross-libelant has in all respects complied with the terms and conditions of his contract with libelant and had his tug at the disposal of libelant for a period of five days at the rate of $50 per day and for which he was not paid, and that he is entitled to receive from libelant the sum of $250.

I further find from the evidence that respondent and cross-libelant is entitled to receive from libelant the further sum of $62.30, representing the value of 300 feet of 2½ inch tow line at 17½ cents per pound, as its hawser was returned cut in pieces and without value. And with re-

spect to the three anchor lights the Court concludes that their loss was not proven.

The libel filed herein should be dismissed at libelant's cost, and there should be judgment in favor of cross-libelant on his cross-libel against libelant in the sum of $312.30, with interest thereon from judicial demand, together with costs.

Let a decree be entered accordingly.