## MENGEL CO. v. INLAND WATERWAYS CORPORATION.

### No. 342.

District Court, E. D. Louisiana,
New Orleans Division.

Sept. 7, 1940.

686

Harry F. Stiles, Jr., of New Orleans, La., for plaintiff.

Rene A. Viosca, U. S. Atty., of New Orleans, La., and L. V. Cooley, Jr., Asst. U. S. Atty., of Slidell, La. (W. I. Connelly, of New Orleans, La., of counsel), for respondent.

CAILLOUET, District Judge.

The libellant herein seeks a personal judgment against the respondent, Inland Waterways Corporation, in the sum of $1,624.16, with interest and costs, for damages alleged to have been sustained by libellant's barge Mengel No. 2, whilst in tow by respondent's S. S. "Thorpe."

At or about midnight of June 24, 1937, at Wood River, Illinois, a three-barge tow was made up, with the barge No. 629 (out of St. Louis, Mo.) in the lead, and libellant's Mengel No. 2 (on starboard or right hand side looking towards the tow from the S. S. Thorpe) and barge R.T.C. (on port). This was done under direction of the Master in charge of the S. S. Thorpe, Captain C. H. White, who after being relieved from duty at 12:05 A.M. by First Class Pilot Walfred T. Thoreen, thereupon retired for his night's rest.

The Mengel No. 2, laden with gasoline, was so incorporated in that tow by reason of the fact that a written contract for its towing had been made and entered into by and between the parties in interest, embodying special "private carrier" stipulations, including, amongst others, the following, to-wit:

1. The towing service rested alone upon such contract; no common carrier status or liability was entailed.

2. Such contract having been made and entered into without inspection of libellant's barge, would be null and void and respondent under no obligation, should the master of respondent's vessel, in his good judgment, find the barge unseaworthy.

3. Such barge was to be moved only at the convenience of respondent, not by any particular tow, and subject to shift from one to another, as frequently as respondent might find it convenient to effect changes.

4. The towing was to be done solely at the risk of libellant, and respondent was not to be liable for any loss or damage as might be sustained in tow by libellant's barge.

5. The masters, crews and employees of all such of respondent's boats as might serve to tow libellant's barge were to be rated servants of said craft to be towed, irrespective of whether said persons were aboard such craft or in command thereof.

Such contract was actually made and entered into on June 16, 1937, by and between Henry M. Baskerville, president of Hennepin Barge Line Company, which held libellant's barge Mengel No. 2 under time charter, and respondent; said president, although then and there authorized to so make and enter into said contract with respondent, and although intending to act for the charterer, did erroneously sign the written contract of tow as if for another company than said Hennepin Barge Line Company. A stipulation, dated June 1, 1938, and filed in the record hereof on November 14, 1939, is to the effect that such contract was executed by said barge line company as charterer of the Mengel No. 2, and that libellant, as owner of said barge, stands in the same position as the charterer in its attack upon said contract, whilst there is available to respondent against libellant all defenses proper to be urged against Hennepin Barge Line Company.

After the Master of the S. S. Thorpe had so retired, the tow, at 12:40 A.M. on June 25th, began its progress upstream on the Mississippi, from Wood River, Illinois, towards Alton Lock No. 26 and dam

(proved to be 4.2 miles away), which point was reached at about 2:00 o'clock in the morning of said June 25, 1937.

The lock was then a completed structure, but the dam was still under construction; presumably, it was for this reason that the lock gates were not yet in use—the lock being kept open.

When the S. S. Thorpe and her tow arrived at the downstream end of the open lock, the U. S. Engineering Department's gasoline tug came through and out of the lock to assist the tow's progress upstream through said lock; this appears to have been (as well may be understood) the usual procedure in maneuvering any tow, against the current, through the open lock.

In addition to this, the engineering department provided two cables, attached to hoists or drums on a pile driver, whereby tows were drawn upriver through the lock, and this was done to the S. S. Thorpe tow on the morning of June 25th, although Pilot Thoreen could not swear whether this occurred before or after the admitted contact of the Mengel No. 2 with the East side wall of the lock.

This cable pulling took place whilst the gasoline tug was on the port side of the towboat, assisting it in shoving the tug forward.

Pilot Thoreen, who was in charge of respondent's equipment during the passage through the lock, did not, however, control the maneuvers. He testified that the rule is that, so soon as a tow enters the lock, it is the U. S. Engineer Department's representative at said lock who has absolute command of the situation; upon his direction to go ahead, for instance, the towing vessel must proceed (he says), irrespective of what may be the tow's position.

Assisting all tows through the lock by means of the shoving and pulling auxiliary aids so supplied by the U. S. Engineers Department, as aforesaid, was the ordinary practice; in fact, so testified Edward A. Ehringer, Assistant Engineer of the S. S. Thorpe, it was impossible for a "boat of any dimensions to shove a single tow through the lock without assistance".

Eldon H. Vorwald, then holding a first-class mate's license, who was mate of the S. S. Thorpe on the morning of June 25, 1937, also testified that the gasoline boat auxiliary aid was under control of the U. S. Engineers Department. "Whenever" said he "a tow came into the locks, this little tug

came out there and just fastened on the tow and helped you through". The procedure (he continued) which was followed as to the S. S. Thorpe tow is the usual one; the little tug comes out to meet a tow entering the lock, and the wire cables are passed out and attached to the tow; the vessel assists the towboat in shoving the tow, while the winch on the dredge winds up the cable slack, and the tow is shoved and pulled forward between the middle and side wall of the lock.

When the S. S. Thorpe tow entered the Alton lock No. 26, at about 2:00 A.M. on June 25, 1937, the weather was fair; there was no wind blowing, and the river was at high stage; so testified Pilot Thoreen, who estimated the current against which the S. S. Thorpe tow was heading to have been running at the rate of approximately 10 miles per hour. The First Assistant Engineer Ehringer characterized it as "terrific", and the Mate Vorwald, who was on the lead barge in tow, was of the opinion that it ran about 3 to 4 miles an hour.

From the testimony of First Mate Vorwald, it appears that the Alton Lock No. 26 is constructed in a slight bend of the Mississippi, and that from the Missouri side comes a cross current against and passing immediately in front of the downriver end of the lock, on to the Illinois bank; so that, a tow moving upriver and about to enter the lock is confronted with a side draft as well as the down draft through the lock. This side current (said Pilot Thoreen) has always existed since the construction of the lock and dam has been going on, and Engineer Ehringer testified: "* * * it was an established fact that the water was swift there and we would have to work a boat to maximum capacity to shove through."

The entry and passage of the S. S Thorpe tow into and through the lock on the early morning of June 25, 1937, was effected in ordinary course, and nothing unusual took place, to judge from the testimony adduced.

The side currrent, as was to be expected, was "setting" the S. S. Thorpe tow into the Illinois sidewall of the lock, and the forward progress was slow. After the lead barge and ⅔ of the length of the Mengel No. 2 had already entered the lock, the Mengel No. 2 came into contact with the Illinois sidewall, sliding along the same.

Pilot Thoreen and First Mate Vorwald both testified that there was no jar or bump

whatever—a mere rubbing and sliding along, with the movement forward very slow. Both insisted that such rubbing and sliding of tows against lock side walls is nothing out of the ordinary, it is an expected occurrence; so much so is this true, that these side walls are referred to as "guide walls", because, said Pilot Thoreen, "that is what they do". It is better, as against a strong current, to have the tow hug the side wall and slide along (continued the pilot), than to have the tow "banged" against such wall whilst attempting to keep to the center of the lock channel.

Engineer Ehringer testified that every trip made through the Alton Lock with a tow saw some barge touching the "guide wall". It was an impossibility, he swore, to go through the lock without touching such guide wall. It is just because such is an expected and unavoidable happening (said he) that the wall is referred to as a "guide wall", and "the idea" is to permit the tow to touch it lightly, rather than to come into severe or jarring contact with it.

It appears established, also, in keeping with said testimony, that the lock walls are constructed with "rub strakes" or bumpers (5 or 6 inches wide, set approximately 3 feet one from the other), for the specific purpose of protecting both lock walls and tows from unnecessary damage which might otherwise result from their apparently expected contacts.

In addition to this, as is usual on navigating vessels, the S. S. Thorpe tow was protected from jarring contact with the lock wall by rope "fenders" or bumpers, placed between the wall and any part of the tow coming in contact therewith. Pilot Thoreen's testimony, for instance, leaves one under the definite impression that such a rope bumper or guard was inserted between wall and barge, at the very point of their contact; and both he and Mate Vorwald testified positively that, in this lock passage of June 25th, the deck hands were on the tow with these rope "fenders" or bumpers in hand and making customary use of the same.

The libel alleged libellant's barge Mengel No. 2 to have been in an entirely seaworthy condition at 12:01 A.M., June 25, 1937, when it was incorporated in the S. S. Thorpe tow at Wood River, Illinois. Respondent made no inspection of it at that time.

By respondent's Exhibit No. 6 in the record, however, it appears that on June 19, 1937, an examination of the barge was made by an authorized Surveyor of the American Bureau of Shipping, for and on account of the owners of said barge, as it lay afloat at Wood River; the official report of such examination showing as follows:

(1) Barge Mengel No. 2 was built in 1916.

(2) The barge's deck plating was "corrugated and badly indented over entire length of barge"; it was "corroded in many places". The side plating was "badly pitted and corroded"; the rivets were "badly corroded".

(3) The shell plating over starboard tanks Nos. 1, 3 and 4, was damaged as follows:

No. 1. "sharply indented about 24" from deck;"

No. 3. "sharply indented about 24" above light load line";

No. 4. "sharply indented about 36" from deck."

Internal examination of tanks and rake compartment was not possible (it was additionally reported) because the barge was not "gas free".

It was only at daylight on the morning of June 25th, that the condition of the Mengel No. 2 was apparent to those on board the S. S. Thorpe tow.

The barge was described by Pilot Thoreen as an old barge, "with a lot of dents and patches in different places, and the plates between the framework were buckled in on both sides and on the back a sunken effect between each frame, etc." The distance between the water line and the deck top (the witness testified) was about 1½ to 2 feet, and whatever "damage" existed was "right on the deck, on top of the deck"; how much, if any, had occurred during the preceding night, he knew not. The deck plates, he continued, were merely laid over the top of the side plates—there was no "doubling" of the plates, no protection, no rib strakes of any kind.

Mate Vorwald's testimony was to the effect that his recollection of the incident in question was no more than that the Mengel No. 2 having "rubbed up" against lock wall, some of the plating was "supposed to have gotten pushed up". "It was a small hole in the barge, anyway", said he.

Engineer Ehringer (so he, himself, testified) had no knowledge of any damage done, nor had been advised of any.

The official report of Captain C. H. White filed by him with respondent, as his employer, described the apparent damage to the Mengel No. 2, as

1. 4 rivets pulled in deck frames, and 11 rivets pulled and that part of the barge where the top of the side plating and the deck plating met (or gunwale), was turned up—approximately 25 inches in length.

2. About 2 feet away, 6 rivets were pulled and the gunwale was again turned up approximately 25 inches in length.

Libellant, as has already been stated, seeks to recover $1,624.16 from respondent for this damage. It contends that the same resulted wholly and solely from the "fault" of the master and crew of the S. S. Thorpe, which libellant charges to have been "unseaworthy" for the particular towing in hand, to have been equipped with a defective steering apparatus, which was "not efficient for the purpose of this towage", and to have been "not the proper type of vessel, either as to design or construction, to perform said towage operation."

At this point, it should be noted that the respondent had, at first, objected and excepted to the libel on the grounds that it was too vague and indefinite to permit respondent's safely making answer thereto, and that it did not "set forth or express a cause or right of action". The first mentioned exception was not insisted on, but trial was had of the second before the then sole judge of this Court, who overruled the same.

■ Judge Borah handed down no written reasons for this action, and libellant's counsel now contend before me that the only construction to be given such overruling is that the Court decreed the special liability-exemption features contained in the towing contract to be invalid, and that "should libellant be able to prove negligence on the part of the master, officers and crew of the steamer 'Thorpe', it was entitled to recovery". They argue, in their supplemental brief, for the application of the rule of "the law of the case", but the circumstances attending this Court's former action—even though Counsel's interpretation thereof were correct—do not warrant such application; I do not consider decision as to the validity vel non of said liability-exemption features in anywise foreclosed.

For the purpose of considering and deciding the exception in question, the Court naturally accepted as true the libel's allegations, for instance, that the S. S. Thorpe was underpowered, unseaworthy, and unfit for the service intended, that it had a defective steering gear, that it offered the only practicable towage service available to libellant for a gasoline barge such as its Mengel No. 2, and that there was no competitive towing service between the barge's points of departure and destination.

■ The allegations of a pleading are to be taken as true on demurrer or exception thereto. United States v. Union Pac. R. Co., 98 U.S. 569, 25 L.Ed. 143.

Under such circumstances the Court could well justify the overruling of the exception of "no cause or right of action", since the contract attacked did not excuse respondent from the legal responsibility of supplying a seaworthy towboat, and its protective clauses might be adjudged invalid if, as a matter of fact, it were proved that because respondent enjoyed a monopoly of the towing business, libellant was constrained by sheer necessity, to make use of its towing service under disadvantageous contract.

Libellant's allegations that

(1) "respondent maintains and operates the only practicable towage service from Hartford, Illinois, to St. Paul, Minnesota, for barges of the weight and size of the Mengel No. 2";

(2) A barge owner "does not have the benefit of competitive services in contracting for towage, but must, under the circumstances, rely wholly and exclusively on said Inland Waterways Corporation for such type of service"; and

(3) The "only practicable way in which the barge Mengel No. 2 could have been towed was by vessel or vessels owned and operated by said Inland Waterways Corporation",
now appear *not* justified, in the light of the definite evidence to the contrary, which was presented (Exhibit 7) by the respondent, in support of its categorical denial of each of these allegations.

For instance, libellant's own towboat, the Mengel, navigated the waters of this section on and about May 26, 1937 (just 3 weeks before the making of the towage contract here in question), having 5 barges in tow, carrying coal and gasoline of an aggregate weight of 3,054 tons. Furthermore, libellant made no attempt to substantiate its contention that no towboat but the

Thorpe was available to tow the barge Mengel No. 2, when loaded (as it was) with a gasoline tonnage far lighter than 3,054 tons.

The contract for the towing of the Mengel No. 2, which specifically provided that its towing by respondent was to be done "at the sole risk of the craft to be towed and its cargo", and that respondent should not be liable for *any* loss or *damage* to said "craft to be towed" or its cargo, is now properly before the Court as respondent's primary defense against libellant's claim, despite the Court's earlier ruling on the exception or demurrer on the trial of which libellant urged (as it still does) the claimed invalidity of the contract's "liability-exempting" provisions. Robinson v. Baltimore & Ohio Railroad Company, 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849.

■ A towing boat such as respondent's S. S. Thorpe is not a bailee, nor an insurer of the safety of the tow nor has it imposed upon it the obligations of a common carrier. Libellant's counsel, in their supplemental brief, admit this. Southern Towing Company v. Egan, 4 Cir., 1910, 184 F. 275; The Hardy, 9 Cir., 1916, 229 F. 985; Ten Eyck v. Director General of Railroads et al., 2 Cir., 1920, 267 F. 974; New Orleans Coal & Bisso Towboat Co. v. United States, 5 Cir., 1936, 86 F.2d 53; Stevens v. The White City, 1932, 285 U.S. 195, 52 S. Ct. 347, 76 L.Ed. 699; The Anita D. (Louisiana Materials Co., Inc. v. Sick), D. C.E.D.La., 1939, 28 F.Supp. 361.

The contract of towage of June 16, 1937, under attack, did furthermore specifically provide that the towing service contemplated rested alone upon such contract, and that neither respondent, nor its boats or servants were to "be held, in any way, to common carrier liability".

The contract, under the terms of which libellant's barge Mengel No. 2 was to be moved at its "sole risk", appears to release the towboat from its own negligence, if negligence there was. The Oceanica, 2 Cir., 1909, 170 F. 893; The Pacific Maru, D.C.Ga., 1925, 8 F.2d 166.

In the case of The Oceanica, supra [170 F. 896], there was an able dissenting opinion, wherefrom is culled the following excerpt, viz.:

"In 1870 the Supreme Court decided in the case of The Syracuse, 12 Wall. 167, 20 L.Ed. 382, that the tug could not be relieved by such an agreement from the consequences of her own negligence. This decision has been followed by a long line of authorities, some of them being cited in the opinion of the court, until the principle has been recognized as an established rule of the admiralty courts, not only by lawyers but by vessel owners as well. In the case of The Edmund L. Levy, 128 F. 683, 63 C. C.A. 235, this court said:

"'The agreement of the canal boat to be towed at her own risk did not exempt the tug from liability for damages occasioned by her own negligence.'

"The wisdom of the rule cannot be doubted. It ought to be against public policy to permit a vessel to contract against her own fault. To allow her to do so begets recklessness, carelessness and neglect. The same reasons for prohibiting such a contract in the case of common carriers apply, though not, perhaps, to the same extent, in the case of a towage contract. In both cases the design is to prevent those who have the absolute control of another's property from extorting an agreement that they may neglect all reasonable precautions to preserve it. I can see no reason for abrogating the rule and every reason why it should be continued."

On rehearing, the Court's opinion was concluded by the following suggestive expression, viz.: "We do appreciate keenly that the decision of the majority of the court as to the right of a tug to contract against her own negligence is a departure from previous decisions. The question should, and we hope will, be set at rest in this case by the Supreme Court."

In due course, the Supreme Court of the United States was petitioned to grant a writ of Certiorari, but denied the writ. John J. Boland et al., Petitioners, v. Steam Vessel Oceanica, etc., 1909, 215 U.S. 599, 30 S.Ct. 400, 54 L.Ed. 343.

This unfavorable action of the Supreme Court in the face of such a record, and particularly despite the expressed hope of the Circuit Court of Appeals that the higher Court would set at rest the question as to the right of a tug to contract against her own negligence (when, admittedly, a departure from previous decisions, including the Supreme Court's own in the case of The Syracuse, supra, decided in 1870, was clearly evidenced by the majority opinion of the Circuit Court of Appeals), can easily be understood, when it is considered that as early as 1872, in the case of New York

Central Railroad Company v. Lockwood, 84 U.S. 357, 17 Wall. 357–384, 21 L.Ed. 627, the Supreme Court, whilst it very properly held:

"1. A common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law.

"2. It is not just and reasonable in the eye of the law, for a common carrier to stipulate for exemption from responsibility for the negligence of himself or servants.

"3. These rules apply to both the common carriers of goods and common carriers of passengers, and with a special force to the latter",

did, nevertheless, pertinently observe: "A common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accommodation or special engagement he undertakes to carry something which it is not his business to carry. For example, if a carrier of produce, running a truck boat between New York city and Norfolk, should be requested to carry a keg of specie, or a load of expensive furniture, which he could justly refuse to take, such agreement might be made in reference to his taking and carrying the same as the parties chose to make, not involving any stipulation contrary to law or public policy. But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not devest it of the character."

In Baltimore & Ohio Southwestern Railway Company v. William Voigt, 176 U.S. 498, 20 S.Ct. 385, 387, 44 L.Ed. 560, which was before the Supreme Court in 1900, upon a certificate from the U. S. Circuit Court of Appeals for the 6th Circuit, asking if an express messenger is a passenger within the rule which prevents exemption of liability for negligence, and which the Court answered in the negative, the Supreme Court, because the Circuit Court of Appeals was of opinion that the case could not be distinguished from that of New York C. R. Co. v. Lockwood, 17 Wall. 357, 21 L.Ed. 627, just quoted from, took occasion to say with reference to that and two other similar cases adverted to, as follows, to-wit:

"The principles declared in those cases are salutary, and we have no disposition to depart from them. At the same time it must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare. It was well said by Sir George Jessel, M. R., in Printing & N. Registering Co. v. Sampson, L. R., 19 Eq. 465:

" 'It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider,—that you are not lightly to interfere with this freedom of contract.' "

Then the Court, in the course of the opinion, added:

"The second fundamental proposition relied on to nullify contracts to relieve common carriers from liability for losses or injuries caused by their negligence is based on the position of advantage which is possessed by companies exercising the business of common carriers over those who are compelled to deal with them.

* * *

"Upon these principles we think the law of to-day may be fairly stated as follows: 1. That exemptions claimed by carriers must be reasonable and just, otherwise they will be regarded as extorted from the customers by duress of circumstances, and therefore not binding. 2. That all attempts of carriers, by general notices or special contract, to escape from liability for losses to shippers, or injuries to passengers, resulting from want of care or faithfulness, cannot be regarded as reasonable and just, but as contrary to a sound public policy, and therefore invalid.

"But are these principles, well considered and useful as they are; decisive of, or in-

deed applicable to, the facts presented for judgment in the present case?

"We have here to consider not the case of an individual shipper or passenger dealing, at a disadvantage. * * *

* * *

" * * * he was not constrained to enter into the contract whereby the railroad company was exonerated from liability to him, but entered into the same freely and voluntarily, and obtained the benefit of it by securing his appointment as such messenger; and that such a contract did not contravene public policy."

In *this* case, can it be reasonably contended that libellant was dealing at a disadvantage with respondent; that it was constrained to enter into the towage contract whereby it agreed that respondent's towing of the Barge Mengel No. 2 was to be at the tow's *sole* risk, and that neither respondent, nor its equipment used in the towage, should be liable for any loss or damage to the tow?

Here, we do not have the situation of a carrier and his customer not standing on a footing of equality, as was the case in New York C. R. Co. v. Lockwood, 17 Wall. 357, 21 L.Ed. 627. Libellant is a business corporation which was actually engaged, at and about the time that the towing contract was entered into with respondent, in towing its own like barges such as its Mengel No. 2, in the same waters through which said barge was towed by respondent.

While true that it was the president of another business corporation (which held the barge under time charter) who agreed to the restrictive and liability-limiting terms of respondent's towage contract, the stipulation of June 1, 1938, is to the effect that libellant, as owner, stands in the same position as the Hennepin Barge Line (the signer) in its attack on said contract, and that all defenses available to respondent against the charterer are available to it against libellant.

The towage contract was entered into on June 16, 1937; the movement of the barge thereunder only began on June 25th. Written "confirmatory" reference to the instrument was made by the letter of June 17th, addressed by the aforementioned President to respondent's representative.

The parties contractant dealt with each other eye to eye, and at arm's length, and, in the language of the United States Supreme Court, in Santa Fe, P. & P. R. Co.

v. Grant Bros. Construction Company, 228 U.S. 177, 33 S.Ct. 474, 478, 57 L.Ed. 787, said parties "were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made. Undoubtedly, it is not to be lightly concluded that the railroad company has been relieved from liability for its neglect, but, on the other hand, if this was the agreement as fairly interpreted, it is not to be arbitrarily overridden. The parties were on an equal footing. * * *"

But even if this were not so, *then* before recovery could be had by libellant, the record before the Court should establish by the preponderance of evidence the alleged negligence of respondent's servants in charge of the Thorpe tow during its transit of the Alton Lock No. 26; or establish the charged unseaworthiness of the vessel.

The mere fact that a tow is received in good order and is delivered in damaged condition does not raise any presumption of fault; as in *this* case, the towing vessel is not an insurer, nor is it liable as a common carrier, and all that it owes to the owner of the tow is the duty of exercising such reasonable care and skill as prudent navigators employ for the performance of similar service. The burden is upon the owner of the tow, as in *this* case, to show conclusively that the alleged loss or damage suffered by the tow was caused by a breach of *that* duty. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. And it is not material that the facts of the case and the causes of the contact with the lock wall are peculiarly within the knowledge of respondent. The L. P. Dayton, 1887, 120 U.S., 337, 7 S.Ct. 568, 30 L.Ed. 669.

The record evidences no satisfactory proof of the claimed negligence, nor does it establish the charged unseaworthiness of the towing vessel (which undoubtedly carried a full crew and was in command of competent officers), and no matter that libellant seeks to demonstrate unseaworthiness by reason of the fact that the vessel's log makes note of repairs effected before, during and after the close of the towing trip, the necessity of such repairs does not establish the charged unseaworthi-

ness, since they were none other than the periodical repairs one would reasonably expect on a towboat operating in the Mississippi River from St. Louis to the Twin Cities (a distance of 673 miles) as the S. S. Thorpe seems to have been doing.

Nor does the record made up show the vessel to have been underpowered and not the proper type of towboat, either as to design or construction, to perform the towage of June 25, 1937. Libellant made no serious attempt to substantiate these charges. On the other hand, Engineer Ehringer testified positively that the Thorpe "was designed to handle six barges,—six 300 barges". This, said he, the vessel did "very capably", and nothing but routine overhauling was ever necessary. The mate Vorwald specifically swore that, as the Thorpe and her tow approached, and then passed through, Alton Lock No. 26 in the early morning of June 25, 1937, the vessel was "in good working order"; that no difficulty was experienced in handling the Thorpe from 2:00 A.M. to the close of his watch at 6:00 A.M.; that "everything worked smooth" upriver from Alton Lock to the end of the trip; and finally that during his two seasons as mate on the Thorpe, there was no complaint made of its stearing, nor about her "propelling machinery". And the official sworn certificate of the inspection made of the Thorpe on April 9, 1937, by the Inspectors of the Bureau of Marine Inspection and Navigation of the U. S. Department of Commerce (a duly certified copy of which is before the Court) shows the vessel, of 319 gross tons, to have been constructed in 1927 and the inspection to have revealed it "in conformity with the laws governing the Bureau" and the "Rules and Regulations of the Board of Supervising Inspectors".

Under the circumstances disclosed by the record, the Court's findings of fact and conclusions of law, are:

## Findings of Fact.

1. The contract of towage was freely and voluntarily made and entered into by the "owner" of the tow, who was on even footing with the other party contractant, and not in a position of forced disadvantage.

2. The S. S. Thorpe was seaworthy and reasonably adequate for the towing service undertaken, and in its transit of Alton Lock No. 26, in the early morning of June 25,

1937, was manned by a crew sufficient in number and competent to exercise, and who did actually exercise, such reasonable and ordinary care, caution and skill in navigating the Thorpe tow through said lock as is usually exercised by persons having experience in like service.

## Conclusions of Law.

1. Under the law and by the terms of the towage contract under attack, respondent occupied the status of a private carrier and was specifically exempted from all liability for any loss or damage suffered by the tow, even though the same were the proximate result of negligence on the part of respondent, its agents, servants and employees. The Oceanica, 2 Cir., 170 F. 893; Monk v. Cornell Steamboat Co., 2 Cir., 198 F. 472; Ten Eyck v. Director General of Railroads, 2 Cir., 267 F. 974; McWilliams Bros. v. Davis, 2 Cir., 285 F. 312; Allen v. Erie R. Co., 6 Cir., 2 F.2d 712.

2. No rule of public policy denies effect to the liability-exempting provisions of said contract; the two contracting parties thereto, under the law, enjoyed the utmost liberty of contracting, and the provisions attacked are within the range of permissive agreement; the highest public policy is found in the enforcement of the contract which was freely and voluntarily made, so that, as the parties have bound themselves one to the other, so shall they remain bound. Marsden's "Collisions at Sea" (9th Ed.) p. 197; Baltimore & Ohio Southwestern R. Co. v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560; Santa Fe, P. & P. R. Co. v. Grant Bros. Construction Co., 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787.

3. If, notwithstanding the terms of the towing contract, respondent was not exempted from liability for the alleged negligence of its agents, servants and employees, then the legal burden rested upon libellant to prove such negligence, by the preponderance of evidence; and that burden libellant has not discharged.

4. Respondent has affirmatively established, by the preponderance of evidence, the entire seaworthiness of the S. S. Thorpe while towing the barge Mengel No. 2.

In view of the premises, let judgment be entered in favor of respondent, dismissing the libel at libellant's costs.