**FOSS LAUNCH & TUG COMPANY, a corporation, Libelant,**

v.

**THE** Former United States Lighthouse Tender KUKUI, etc., and Independent Iron Works, Inc., a corporation, Respondents.

No. 26031.

United States District Court
N. D. California, S. D.

April 1, 1955.

Dorr, Cooper & Hays, San Francisco, Cal., for libelant.

J. Donald Pettus, San Francisco, Cal., for respondent.

EDWARD P. MURPHY, District Judge.

This is a suit for tug hire and for money expended by libelant in payment to another tug for assisting in the towage. I shall set forth the facts quite generally and then relate them more particularly to the legal issues involved.

On December 7, 1951, Foss Launch & Tug Company entered into a contract of towage with Independent Iron Works, Inc. Foss agreed to provide the tug Martha Foss to tow two of Independent's barges from Oakland, California to Hawaii. At Honolulu, the Martha Foss was to pick up three tows—The Columbia, the Kukui and the Intrepid, and tow them to Oakland. Independent agreed to pay tow hire in the amount of $750 per day commencing on the pick-up of the tows in Oakland and terminating on delivery at Oakland.

The two barges were picked up at Oakland on the 15th day of December, 1951 and towed to Hawaii without incident. They arrived on January 1, 1952. There was some dispute with the Coast Guard over the master's license but that was resolved.

The three tows were at Independent's docks in the Kapalana Basin in Honolulu. They were taken to Pier 2 where the tow was to be made up on January 4, 1952. The tow had been provided with bridles and surge chains by Independent. Captain Hilton, the master of the Martha Foss, suggested certain changes in the towing arrangement. Captain Powers, Independent's marine supervisor in Honolulu, acquiesced. The changes were completed on January 5, 1952. The weather was bad, so the tug did not depart. The Martha Foss, with the Columbia, Kukui and Intrepid in tow left Honolulu Harbor on January 6, 1952.

On January 10, 1952, the Columbia was observed breaking in two. Captain Hilton reeled in the towing hawser but the Columbia was sinking fast and the master ordered the towing hawser burned. The Columbia sank almost immediately. The hawser between the Intrepid and the Kukui severed. Due to the Intrepid's higher freeboard, it drifted away from the Kukui. The Martha Foss stood by the Kukui and made efforts to retrieve her, finally succeeding in the early morning of January 15th. The Martha towed her to a port of refuge at Kaunakakai on the south side of Molokai Island arriving on the 16th at 1800 hours.

The Coast Guard was keeping track of the Intrepid. Captain Hilton had informed Foss at Seattle of his situation and advised that he could recover only

one vessel. When Foss communicated with Independent, Foss was told to recover both vessels despite the fact that Foss explained this would be impossible for the Martha. Foss hired Young Brothers to retrieve the Intrepid. The Young Brothers' tug Miki-Miki picked up the Intrepid and towed her to Kaunakakai.

At Kaunakakai, Captain Hilton was joined by Mr. Campbell, an official in the Foss Company, who had flown from Seattle. They discovered small holes in the bow of the Intrepid at the water line. Sea water was flowing from these holes. Mr. Campbell asked Independent's representatives to come to Kaunakakai but Independent's president in Oakland ordered them not to go. He told Foss that Independent had a contract and to bring both vessels.

Captain Hilton decided that the Intrepid was unfit for the tow across the Pacific during that time of year. Young Brothers returned her to Independent at Honolulu. The Martha towed the Kukui to Oakland and delivered her on February 3, 1952.

Respondents contend that the Columbia was lost due to the negligence of the tug master in rearranging the tow setup; that the tug was unseaworthy as improperly manned, fueled and powered; that libelants breached the towage contract by returning the Intrepid to Honolulu and by failing to deliver the Columbia; and that delay was caused by defects in the master's license and by the negligent arrangement of the tow which caused the Intrepid and Kukui to come adrift.

These are asserted both as defenses in the answer and are asserted as bases for affirmative relief in the cross-libel.

■■ It is fundamental that a towage contract does not constitute a bailment. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. There is no guarantee that the towed vessel will be delivered. The remedy for failure to deliver must sound in tort.

B. Turecamo Towing Corp. v. U. S., 2 Cir., 1942, 125 F.2d 1001. The contract here provides that the loss of a tow will not affect the hire due.

*The Delays*

■ The contract provides that in the event of any delay "arising solely from the fault of Foss and/or the tug, time so lost if in excess of twenty-four hours shall be deducted from charter hire".

A. *Getting Under Way*

The Martha had delivered the two tows and was fast at Young Brothers' pier at 1725 hours on the first of January. Captain Hilton's license was limited to Pacific Ocean coastwise. He had made several trips to Honolulu and back on this license and it had never been questioned. However, when the Martha arrived the Coast Guard did question his license. This was resolved and on the 4th of January the Coast Guard endorsed his license to make it applicable to any ocean.

It is clear that if this license matter caused any delay it is chargeable to Foss. While reconstructing what might have happened is always difficult, I have carefully examined the log to determine when the Martha could have got underway if the license difficulty had not taken place. The tows were in the same condition on the 1st as they were on the 4th when they were taken to pier 2 to make up the tow. The change in the towing bridles and surge chain is not chargeable to Foss.

It took the Martha four hours to refuel and one working day to transport the tows to pier 2 and get ready for sea. I believe that without the delay regarding the license the tow could have been ready for sea on noon of the 3rd. This requires no work on the 1st and allows the same amount of time for the necessary work as it actually took.

The tow was ready for sea at 1400 hours on the 5th. Departure was delayed by weather, which is not chargeable to Foss. The delay of 50 hours from noon on the 3rd to 1400 hours on the 5th is chargeable to Foss.

## B. Retrieving the Kukui and Intrepid

■ The sinking of the Columbia caused the other two tows to be set adrift from the Martha. If the sinking was due to the Martha's fault, Independent need not pay for the delay in recovering the tows and restarting the tow. As discussed below, no negligence of Foss caused the sinking of the Columbia.

The respondents argue that the change in the towing arrangement made by Captain Hilton caused the Intrepid and Kukui to be severed from the tow, because Captain Hilton's set-up did not allow for the release of a sinking tow without the release of the other tows. It is not necessary to go into the towing arrangement or the changes made by Captain Hilton. It is clear that the conditions of the sea were such that when the Columbia sank, the tow line would have had to be cut in the manner it was cut, whatever were the towing arrangements. I do not believe that Captain Hilton was negligent in setting up the tow, but it is crystal clear that his arrangement in no way caused or contributed to the Intrepid and Kukui being set adrift.

### Seaworthiness

■ Whatever the defect in Captain Hilton's license, it was corrected before the return tow home. He was properly licensed during the events which give rise to this controversy.

The tug was capable of the tow undertaken. Her fuel capacity has nothing to do with this. Foss was willing and able to refuel her at sea.

### Loss of the Columbia

■ Respondents contend that the Columbia was lost because the change in the towing arrangement subjected her to unreasonable stresses. The increased stresses due to the changes were relatively minor. The Columbia sank because she was weak. She was not fit to be towed across the Pacific during that time of year. Captain Hilton acted as a careful prudent navigator in his handling of the tow. Foss is not liable for the loss of the Columbia.

## The Money Paid to Young Brothers to Recover and Return the Intrepid

■ The contract provides:

"Independent shall pay in addition to the daily hire hereinafter set forth all port charges, pilotage, dockage, *assistance towage required, if any,* and any other expense incurred in addition to the hire of the tug". (Emphasis added.)

The necessity to obtain assistance towage arose out of no fault on the part of Foss. The master has the duty to recover tows which have been set adrift. Foss is entitled to reimbursement for the money expended in hiring Young Brothers. The parties have stipulated that Young Brothers' charge was reasonable.

## The Failure to Tow the Intrepid

■ In the contract of towage Foss agreed to provide the tug Martha Foss to tow the Columbia, Intrepid and Kukui from the Hawaiian Islands to Oakland.

Independent Iron Works contends that the failure to tow the Intrepid is a breach of that contract and both precludes recovery by Foss for tow hire and makes Foss liable in damages. This contract expressly stated that the failure to deliver any vessel would not affect the hire due. Nevertheless, I am of the opinion that if Foss refused to tow the Intrepid wilfully and solely because Foss just did not desire to undertake the tow, this would breach the contract. Cf. The Algitha, D.C.Md.1883, 17 F. 551; San Francisco Bridge Co. v. Charles Nelson Co., 1st Dist., 1936, 10 Cal.App.2d 685, 52 P. 2d 978, 53 P.2d 759.

Factually this is not the case here. The Intrepid was not towed because Captain Hilton, the tug master, believed that she was not fit to make the tow. Much of the trial was directed toward the question of whether the Intrepid was or was not fit for the tow. The Court heard the results of a marine survey made shortly after the Intrepid was returned to Honolulu. Pictures indicating her condition last year were shown. Testimony was taken which would relate her condition now to her condition in early January

of 1952. Captain Powers testified regarding the preparation he made to make her fit for the voyage. It is difficult now, with all this, to say whether she was or was not fit to make the tow at the time she was returned to Kaunakakai. As I view the law, this I need not decide.

It is quite clear to me that Captain Hilton exercising "that degree of caution and skill which prudent navigators usually apply in similar circumstances" could quite reasonably believe at that time that the Intrepid was not fit for the tow. I have found no case, and counsel have cited none, where this test is applied as a defense in a suit for failure to take a tow.

It is also clear that the tug owner is responsible for navigation of the tug and tow. The master is obligated to perform his duties with such reasonable care and skill as prudent navigators usually employ in similar undertakings. The Webb, 1872, 14 Wall. 406, 81 U.S. 406, 20 L.Ed. 774.

If he does not employ this skill in protecting his tows the tug is liable for any damage resulting therefrom. Curtis Bay Towing Co. v. Southern Lighterage Co., 4 Cir., 1952, 200 F.2d 33; Scott v. Connell Steamboat Co., D.C.S.D.N.Y. 1894, 59 F. 638, 639.

The standard should be the same whether the master keeps a vessel in the tow or releases it from the tow and takes it to a port of refuge. He can do only one of these two things. The master must decide and he must decide according to the care and skill of a prudent navigator. If he exercises that requisite degree of skill, the tug is not liable even if it can be determined now at this late date, by persons who were not there, that a different choice would have been more nearly correct.

Foss is not liable for the failure to tow the Intrepid.

I do not decide and need not decide, whether Paragraph 7 of the Towage Contract would be a defense to Foss.

The parties have stipulated that the question of damages be decided at a later time. There is some question as to the amount of Young Brothers' bill. Nothing at the trial was directed toward who was to pay the Federal transportation tax. I will determine these questions at a future hearing to be set at the convenience of the parties involved.