DILLINGHAM TUG & BARGE CORPO-
RATION, a corporation, Plaintiff,

v.

COLLIER CARBON & CHEMICAL
CORPORATION, Defendant.

UNION OIL COMPANY OF CALIFOR-
NIA, Third-Party Plaintiff,

v.

NICKUM & SPAULDING ASSOCIATES,
INC., The Salvage Association, Limited,
and Todd Shipyard Corporation, Third-
Party Defendants and Cross-Complain-
ants.

Civ. No. C–77–1654–WAI.

United States District Court,
N. D. California.

Feb. 26, 1981.
Supplemental Finding Sept. 11, 1981.

John R. Pascoe and Forrest Booth of Hancock, Rothert & Bunshoft, San Francisco, Cal., for plaintiff.

David Van Hoesen of Williams, Van Hoesen, Brigham & Epstein, San Francisco, Cal., Seth W. Morrison of Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., Hans E. Menter and Dennis P. Codon, Los Angeles, Cal., for defendant and third-party plaintiff.

Samuel A. Keesal, Jr. and Scott T. Pratt of Keesal, Young & Logan, Long Beach, Cal., for Collier Carbon & Chemical Corp.

Norman B. Richards and Van H. Cline of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for third-party defendant and cross-complainant Salvage Ass'n.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge, Sitting by Designation.

This action came on to be heard by the Court on September 16, 1980, and the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff Dillingham Tug & Barge Corporation (Dillingham), formerly Hawaiian Tug & Barge Co., Ltd. (HT&B), is the owner of the tug MOANA HOLO.

2. Defendant and Third-Party Plaintiff Collier Carbon & Chemical Corporation (Collier), a division of Union Oil Company of California (Union) was the owner of Barge 2506, known as the COLUMBIA.

3. Third-Party Defendant Nickum & Spaulding Associates, Inc. (Nickum & Spaulding) is a firm of naval architects and marine engineers practicing in Seattle, Washington, having performed professional services on behalf of Collier in connection with the preparation for the tow of the barge COLUMBIA from Galveston to Portland.

4. Third-Party Defendant, The Salvage Association, Limited (Salvage Association), is a firm of professional surveyors with offices throughout the world with the Houston Office of Salvage Association having performed services on behalf of Collier in connection with the tow of the COLUMBIA.

5. Third-Party Defendant Todd Shipyard Corporation (Todd) performed modifications specified by Nickum & Spaulding on the COLUMBIA on behalf of Collier in connection with the single ocean tow from Texas to Oregon through the Panama Canal.

6. In 1971, Collier purchased the HEDGES, an open-hopper river barge operating on the Mississippi River. The HEDGES carried two insulated tanks used for transporting anhydrous ammonia and was equipped with a cover for the tanks and hopper. Collier planned to use the HEDG-

ES on the Columbia River. Collier arranged with Nickum & Spaulding to design modifications for the HEDGES so it could be towed from the Gulf through the Pacific to Portland, Oregon. After the modifications were completed, the HEDGES was successfully towed to the Columbia River by Foss Tug & Barge (Foss), a subsidiary of Dillingham.

7. In May 1976, Collier purchased another open-hopper river barge operating on the Mississippi River. This barge, the COLUMBIA, was designed and equipped similarly to the HEDGES. It was 300 feet in length and carried two insulated tanks, each 280 feet in length by 18 feet in diameter, but unlike the HEDGES, the COLUMBIA lacked a hopper cover.

8. On July 16, 1976, Collier retained Nickum & Spaulding to prepare plans and specifications for modification of the COLUMBIA to permit a one-time, no cargo ocean delivery tow from Galveston to Portland. This modification was required because the COLUMBIA was originally built for river traffic only and was not sufficiently structured to qualify for service as an ocean-going barge. Nickum & Spaulding completed its assignment in time for Collier to submit the project for bids on October 1, 1976. Nickum & Spaulding also completed an "Analysis of Longitudinal Strength and Intact and Damages Stability" which, with the modification plans, was submitted to the U. S. Coast Guard and the American Bureau of Shipping (ABS) for approval, which approval was obtained.

9. Collier received two bids for the modification of the COLUMBIA, which included adding a hopper cover. The lowest bid was $784,000, made by Todd. Collier, considering the bid to be excessive, sought to reduce the cost of modification by alteration of the modification. It consulted with Nickum & Spaulding on November 16, 1976, as to whether the proposed hopper cover could be eliminated to reduce modification cost.

10. After contacting the Coast Guard and the ABS, Nickum & Spaulding determined that neither of these organizations

had any objection to the proposed tow proceeding without a cover. They also obtained conditional approval for the one-time tow from the Coast Guard.

11. Nickum & Spaulding undertook to calculate the effect on the barge's seakeeping performance that would be created by a flooding of the hopper, a possibility which could occur because of the elimination of the hopper cover. On November 19, 1976, they advised Collier that the hopper cover could be eliminated if additional tie-down straps were installed to insure that the barge would remain afloat even if the hopper became fully flooded with water. They never advised Collier that there was an increased risk by removing the cover nor did they advise Collier that the calculations were incomplete in any way or that proper calculations were not performed.

12. Because Collier needed approval of a salvage association in order to obtain insurance on the tow, they contracted with the Salvage Association to perform the insurance approval survey.

Collier's contract with the Salvage Association contained the following clause:

> The Salvage Association London believes that the surveyor appointed by them is fully competent to carry out this survey but the resultant certificate will be issued on the express condition that neither the Salvage Association London nor the surveyor shall in any circumstances be responsible or liable to any person for any act or omission, default or negligence of the surveyor in the conduct of the survey or the contents of the certificate or for any situation or event which may occur subsequent to the issue of the certificate.

13. The Salvage Association undertook to determine whether or not the barge, the tug and the towing arrangements were satisfactory for the contemplated tow of the COLUMBIA from Galveston to Portland. They prepared instructions for Collier as to how to adequately prepare the COLUMBIA for the voyage and included instructions requiring that suitable calculations be made concerning the strength of the COLUMBIA in both "hopper dry" and "hopper flooded" conditions.

14. In December 1976, negotiations began between Collier and Dillingham for the tow of the COLUMBIA from Galveston to Portland by the newly constructed tug MOANA HOLO, then in the Gulf area, which would be in service in and around Hawaii after this initial tow. As a model for a contract for COLUMBIA tow, the companies used the 1971 HEDGES contract between Foss and Collier.

15. On January 19, 1977, Dillingham and Collier entered into a towage agreement by which Dillingham agreed to tow the COLUMBIA from Galveston to Portland. Under the terms of the contract, Collier agreed to pay Dillingham $125,000 for the towage service to "be deemed earned by HT&B upon the commencement of the towage service even though at any stage of the venture thereafter the barge be lost." The contract further "provided that HT&B shall have due regard to the recommendation of the Salvage Association." It also provided that "neither HT&B nor the tug shall be responsible for the loss of . . . the barge . . . arising from act, neglect or fault of the master . . . or the servants of HT&B in the navigation or in the management of the tug, tow or towing equipment, . . . and any other cause arising without the actual fault and privity of HT&B and without the fault or negligence of the agents or servants of HT&B."

16. Collier contracted to "indemnify, defend and hold harmless HT&B . . . against all claims, liabilities, loss or expense, including costs and attorneys' fees arising out of or connected with . . . loss of . . . the barge unless such shall have been due to the sole fault of HT&B."

17. The towage contract also provided that "Collier shall maintain hull and machinery and protection and indemnity insurance on the barge to its full value in form and amount satisfactory to HT&B and such policies shall be endorsed with waiver of subrogation against HT&B and the tug and shall name HT&B as an additional assured (sic) with loss payable to Collier," with Col-

lier looking "solely to its hull and machinery insurance for any loss (of) ... the barge."

18. Collier listed the COLUMBIA on Union's fleet policy, which policy had a $1,000,000 deductible, but was unable to name HT&B as an additional insured. It is disputed whether Collier advised HT&B of the deductible and of its inability to name HT&B as an additional insured during a telephone conversation on February 23, 1977, four days before the commencement of the tow. Collier did confirm these facts in a letter dated January 27, 1977, but it is contended by Dillingham that this letter did not arrive until after commencement of the tow on January 29, 1977.

19. The Salvage Association, in conducting its survey, undertook to review the plans and specifications designed by Nickum & Spaulding. They employed an independent naval architect to review the calculations to determine whether or not there was sufficient stability of the barge to successfully complete the tow.

20. The Salvage Association performed the survey and after being advised by their independent naval architect that the calculations of Nickum & Spaulding were sufficient, approved the tow and provided towing recommendations to Collier and to Dillingham's tugboat captain, Anthony Schaeffer. These recommendations included the following:

(1) Daily reports from the tug on the condition of the barge were to be made to the Salvage Association;

(2) Collier and the Salvage Association were to be immediately advised of any unusual condition of the tow;

(3) The towing speed was not to exceed 8 knots and if weather conditions requires it, the towing speed was to be reduced to eliminate any possible damage to the barge; and

(4) The crew of the tug was to check out the condition of the barge periodically in order to assure that it had not taken on water, and, if it had, the water was to be pumped out immediately.

21. After modifications were completed by Todd and prior to the COLUMBIA's departure from Galveston, the barge, including its pumping equipment, was checked by Captain Schaeffer of Dillingham's MOANA HOLO and by representatives of Collier, Todd and the Salvage Association.

22. On January 22, 1977, the COLUMBIA in the tow of the MOANA HOLO commenced its voyage from Galveston in route to Portland via the Panama Canal. At that time, the COLUMBIA was ballasted with a forward draft of 5'0" and an aft draft of 6'09". One foot high white lines were painted on the COLUMBIA's corners at the water line in order for the tug crew to more easily determine if the barge was sitting lower in the water as a result of water in the hopper.

23. On February 7, 1977, the tug and tow arrived in Cristobal, Panama Canal Zone, at which time the tug crew attended on board the COLUMBIA for the first time since the voyage began. The forward compartment of the hopper contained between one and three feet of water. The surveyor for the Salvage Association in Panama recommended that the water in the hopper be pumped out before proceeding further. While his survey report states that it was pumped out, the evidence clearly shows the contrary.

24. Even though Panamanian officials refused to allow water to be pumped into the Canal, the tug crew attempted unsuccessfully to use the portable bilge pumps on board the COLUMBIA to pump out the accumulated water. They never attempted to use the built-in bilge system on the COLUMBIA nor did they attempt to correct the problem with the portable system by obtaining longer hoses. As a result, the water in the forward compartment of the COLUMBIA's hopper was never removed. The COLUMBIA left Balboa, Panama Canal Zone, on February 13, 1977, with a forward draft of 5'6" and an aft draft of 6'7".

25. From February 13, 1977, through February 25, 1977, the tug logged the fol-

lowing average ground speeds: 8.6 knots, 9.1 knots, 8.4 knots, 9.3 knots, 9.2 knots, 8.33 knots, 8.6 knots, 8.3 knots, 8.4 knots, 9.3 knots, 9.1 knots, 8.66 knots and 7.5 knots. From noon February 15, 1977, through noon February 25, 1977, the average speed of the tug through the water was 8.3 knots.

26. On February 20, 1977, the tug and tow put into Acapulco because of a problem with the fresh water system aboard the MOANA HOLO. At no time while in Acapulco was any attempt made to pump out water which had collected in the COLUMBIA's hopper although the tug and tow remained in Acapulco for 22 hours and pumping could have been accomplished.

27. On February 25, 1977, at 0300 and then at 0715, Captain Schaeffer reduced speed from 900 rpm's because the tug and tow were "pitching hard in rough (northwesterly) swells" as they encountered "heavy sea (from) head on" causing "heavy strain on (the) tow gear".

28. At 0730, when Second Mate Malina took command, he noticed that the barge was taking heavy spray into the hopper, that it was possibly taking green waves, that it was pounding and diving and that the bow of the barge was down to a point where he could not see the white waterline which had been painted on the COLUMBIA. At that time, Bahia Santa Maria, a possibly suitable port of refuge, was approximately 20 miles north-northwest of the tug and tow. At 0742, Second Mate Malina reduced the speed of the tug to 800 rpm's "due to heavy seas (from the northwest)." No change in direction was made at this time.

29. At 0900 the tug and tow made a normal course change from 316 degrees to 320 degrees, continuing in a basically northwesterly direction. At 1030 the tug contacted KCR in Long Beach to give an "ETA Long Beach 1 March 1980".

30. At 1120 Second Mate Malina reduced the speed of the tug to 720 rpm's "due to heavy (northwesterly) seas", but noticed that the tow continued to take spray. At 1215 he further reduced the speed of the tug to 650 rpm's.

31. At 1235 Captain Schaeffer determined the "bow of (the) COLUMBIA (was) down" and changed course north-north-westerly to 345 degrees to "head for Bahia Ballenas to pump out (the) bow" of the COLUMBIA. At that time Bahia Ballenas was over 100 miles away and into the northwesterly seas, while Bahia Santa Maria was closer and due east of the position of the tug and tow.

32. At 1305 the "port cargo tank on (the) barge COLUMBIA (had) broken loose" and the "barge (was) listing to port heavily". At that time Captain Schaeffer made a course change to 100 degrees heading easterly to Bahia Santa Maria. At 1345 he made a slight course change to 110 degrees "to avoid a 6 fathom mark". At 1400 the tug logged an unexplained 810 rpm's. At 1430 another course change was made to 90 degrees. At 1517 the "port cargo tank (apparently broke completely loose and was) carried away and ... float(ed) astern of the barge COLUMBIA"

33. At 1530 the tug attempted unsuccessfully to contact the U. S. Coast Guard in San Francisco. At 1540 the tug contacted KCR to report "port cargo tank broken loose—pos(sible) hazard to Nav(igation)—Pro(ceeding) to San Larazo."

34. At 1656 the log showed the "starboard tank broke away" and was "drifting (southwesterly)."

35. At 1850, while heading to Bahia Santa Maria with the barge, the tug, "slow(ed) down (and) turn(ed) right to avoid (an) oncomming (sic) fishing vessel." As a result at 1900 the "barge COLUMBIA went down" and the tug "sliped (sic) (the) starboard tow cable 41 miles from San Lorenzo." The Captain testified that he ordered the cable slipped, even though he had no instructions to do so, because of the danger it presented the tug.

36. The MOANA HOLO remained in the vicinity of the sunken barge to police the area and to search for the tanks visually and by radio contact with other vessels. On February 26, the Captain determined that the sunken barge was no danger to naviga-

tion, even though it sank with the bow up. He reported that there was no success in finding the tanks. On February 27, the MOANA HOLO left the area to continue its voyage to Long Beach.

37. When the MOANA HOLO reached Oakland she secured a substitute tow from Oakland to Oregon for which she was paid $20,000.00.

38. Collier obtained a replacement barge which was then in service on the Mississippi River. This barge was similar to the sunken barge. It was successfully piggybacked from the Gulf to Portland for a total cost of $2,573,339.89.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction since the cause of action herein constitute admiralty and maritime claims for relief under Rule 9(h) of the Federal Rules of Civil Procedure.

2. The sinking of the barge Columbia was due in part to the negligence of the Captain and crew of the tug MOANA HOLO. A tug has the duty to inspect the barge in her tow and to keep the barge under close observation while under tow. *McDonough Marine Service, Inc. v. M/V ROYAL STREET*, 465 F.Supp. 928, 934 (E.D.La.1979); *Dwyer Lighterage, Inc. v. Christie Scale Corp.*, 1951 AMC 946 (E.D.N. Y.1951); *A. E. Staley Manufacturing Co. v. Porto Rico Lighterage*, 323 F.Supp. 27 (E.D. La.1970), aff'd per curiam, 438 F.2d 1 (5th Cir. 1971).

The degree of care of the tug is measured with reference to the character of the tow and conditions of the sea and weather. *Ocean Burning v. Moran Towing and Transportation*, 1974 AMC 2307 (S.D.N. Y.1974). Under the facts of this case, it was negligence to allow the barge to become so full of water that it was down by the bow. *McDonough Marine Service, Inc. v. M/V ROYAL STREET, supra; Mississippi Valley Barge Line v. T. L. James Co.*, 1956 AMC 2186 (E.D.La.1956), aff'd 1957 AMC 1647 (5th Cir. 1957).

3. The Court does find that the barge was unseaworthy for the anticipated one-time tow; however, even if it was, the towing vessel would be liable in negligence if it continued to proceed when the unseaworthiness of the vessel was disclosed. As set out in Findings of Fact 28 through 35, it was apparent at 0730 on February 25, 1977, that the barge was in peril. She was then approximately 20 miles north northwest of Bahia Santa Maria. The condition worsened and at 1235 instead of heading for Bahia Santa Maria, Captain Schaeffer decided to head for Bahia Ballenas which was over 100 miles away. While the Court recognizes the fact that the Captain's judgment must be respected in extremist situations, it is very difficult to understand why the Captain sought to seek shelter in a harbor over 100 miles away when one was available one-fifth of that distance. In fact, at 1305 the Captain did decide to head for Bahia Santa Maria, but by this time the barge was beyond saving. *McDonough Marine Service, Inc. v. M/V ROYAL STREET, supra; Otto Candies, Inc. v. Great American Insurance Co.*, 221 F.Supp. 1014 (E.D. La.), aff'd per curiam, 332 F.2d 372 (5th Cir. 1964). This negligence of Dillingham contributed to the sinking of the COLUMBIA by 60%.

4. The exculpatory provisions contained in the towage agreement between Collier and HT&B were stricken down by Magistrate Rothwell in his ruling of November 22, 1977. The Court joins in the reasoning of Magistrate Rothwell in striking down those provisions under the law as stated in *Bisso v. Inland Water Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). The United States Supreme Court in *Bisso* held that the requirement placing the "sole risk" of the tow on the barge was invalid. The exculpatory provisions in this towage contract are likewise invalid.

While the exculpatory provisions contained in the towage agreement have been stricken as decreed in *Bisso*, nevertheless, the insurance provision falls within *Twenty Grand Off-Shore v. West India Carriers, Inc.*, 492 F.2d 679 and is valid. With reference to the insurance provision in the

towage agreement, see Findings of Fact 17. Collier did not insure the barge for full value, but covered it under its fleet policy which had a million dollar deductible clause. The barge at the time of the sinking had a value of $1,901,245.28. By placing the barge in its fleet policy with the million dollar deductible clause, Collier became a self-insurer for the million dollars. Collier solicited bids from several tow boat companies before entering into the agreement with Dillingham. See Page 000127, *et seq,* of the transcript of September 24, 1980. The evidence shows that there was no monopoly of the tow boat market or that there was any form of a monopolistic agreement among tow boat operators. There was no evidence that the barge owner was overreached by the tug owner or that the tug owner was in a position to drive hard bargains. The tug owner's liability to the barge owner is unaffected by the insurance clause. As stated in *Twenty Grand, supra,* "The simplistic, syllogistic approach of the barge owner is inviting because we agree with the major premise that *Bisso* condemns exculpatory clauses that relieve the legal liability of a negligent tower. But the minor premise that compulsory insurance clauses are exculpatory, *per se,* in the context of *Bisso,* is unsound. Such a doctrinaire interpretation is not supported by the reasons undergirding *Bisso.*" The Court therefore limits Collier's recovery regardless from whom to $901,245.28.

■ 5. Nickum & Spaulding were requested to perform certain calculations for preparation of the barge for the tow. The problem presented was unique. They undertook to calculate the effect of the barge's seakeeping performance that would be created by a flooding of the hopper, a possibility which could occur because of the elimination of the hopper cover. As stated in Findings of Fact 11, they advised Collier that the hopper cover could be eliminated if the additional tie-down straps were installed to insure that the barge would remain afloat even if the hopper became fully flooded with water. They never advised Collier that the calculations they made were incomplete in any way or that proper calcu-

lations were not performed. (See testimony of Snyder of Sept. 19, 22, and 23, 1980, and particularly pages 69, 70, and 71 of the transcript of Sept. 19, 1980.) After the sinking, Mr. Nickum and Mr. Spaulding apparently were dissatisfied with the work and calculations their company performed prior to the sinking, as they had additional calculations made on March 9th and 10th. These calculations showed the *straps were not sufficient.* It is true that these calculations were performed over the objections of Mr. Snyder and he did not agree with the results. (See pages 69, 70 of the transcript of Sept. 19, 1980.) The errors in cálculations and particularly the failure to advise Collier, constituted negligence on the part of Nickum & Spaulding which directly contributed to the loss of the Barge COLUMBIA by 20%.

■ 6. A surveyor is charged with the duty of using due care in making his recommendations and of detecting all perceptible defects of the vessel encountered during the survey and notifying the owner thereof. *Great American Insurance Co. v. Bureau Veritas,* 338 F.Supp. 999 (S.D.N.Y.1972), aff'd, 478 F.2d 235 (2d Cir. 1973); *Steamship Mutual Underwriters v. Bureau Veritas,* 380 F.Supp. 482 (E.D.La.1973). The Salvage Association expressly undertook to determine whether or not the barge, the tug, and the towing arrangements were suitable for the anticipated one-time tow from Galveston to Portland. See Finding of Fact 13. To this end, the Salvage Association made specific recommendations and required that certain calculations be made to determine *if the barge had sufficient stability* to complete the tow. See Findings of Fact 13, 20. Thereafter, the Salvage Association undertook to review the calculations of Nickum & Spaulding to determine if the calculations were proper. In undertaking to perform these additional services, the Salvage Association was required to perform them in a non-negligent manner.

■ The Salvage Association then delegated this review of the calculations to an

independent naval architect, David Waller. See Finding of Fact 19. The responsibility of performing the review, though delegated to Waller, was still with the Salvage Association. If the Salvage Association determined that the calculations were improper, it had the duty to inform Collier of this apparent "defect." By relying on Mr. Waller for its assumed duty to review the calculations, the Salvage Association was responsible for any errors or omissions of the naval architect whom it hired. The Court realizes that in general an independent contractor's negligence can be avoided by his employer. Under the facts of this case, however, the Salvage Association hired an independent contractor to perform a job which it knew was vital to the survey. By undertaking to review the calculations of Nickum & Spaulding, the Salvage Association assumed duties not normally performed by a surveyor. The Court finds that this responsibility could not be delegated to its independent naval architect. If the review was negligently performed, which this Court holds it was, that negligence is attributable to the Salvage Association.

The Court, therefore, finds that the Salvage Association breached a duty which it had expressly and implicitly undertaken. The review of the calculations of Nickum & Spaulding was negligently performed. Had proper review been made, the Salvage Association would have then had the duty to inform Collier that the calculations were in error and that the tow should not proceed. This breach of duty, which resulted in the tow being approved for the voyage, contributed to the loss of the barge in a manner similar to Nickum & Spaulding and in a similar percentage of 20%. The exculpatory provisions in the Salvage Association's survey are unenforceable as being contrary to *Bisso*. The Salvage Association's claim for attorney's fees is without merit.

7. Todd settled out of court with Collier and Collier assumed Todd's defense to all cross-claims on which the Court finds no liability.

8. Paragraph 5 of the Towage Agreement, Plaintiff's Exhibit 1, provides as follows: "Port charges, Panama Canal fees, customs' fees, assisting tugs and any wharfage chargeable in connection with the towage of Collier's barge shall be paid by Collier." The Court has heretofore held that the towage agreement was violated due to Dillingham's negligence. Nevertheless the flotilla did transit the Panama Canal and incurred fees and expenses in the amount of $9,737.40, which were paid by Dillingham and for which Dillingham is entitled to recover, plus interest at the rate of 7½% per annum from March 29, 1977, until paid.

9. The towage agreement in Paragraph 2, provides in part:

"HT&B shall be paid $125,000.00 for the towage service, which sum shall be deemed earned by HT&B upon commencement of the towage service even though at any stage of the venture thereafter the barge or tug be lost or become unfit to continue to designation . . . ."

As Justice Black in *Bisso* states: "The question presented is whether a tow boat may validly contract against all liability for its own negligent towage." 349 U.S. at 85, 75 S.Ct. at 629. *Bisso* answered in the negative. It struck down a contract releasing towers from all liability for their negligence as against public policy. *Bisso* also held that, "Contractual exemption of a tow boat from responsibility for its own negligence cannot be defeated by the simple expedience of providing in a contract that all employees of a tow boat shall be employees of the towed vessel . . . ." 349 U.S. at 95, 75 S.Ct. at 635.

*Bisso* also holds that you cannot contract against your own negligence. The barge in this instance was lost due primarily to negligent towage. If it is against public policy to contract against your own negligence, it is also against public policy to profit from your own negligence which in this case would be collecting the towage.

While the towage agreement does its utmost to relieve HT&B of all responsibility, nevertheless, the last sentence in paragraph 4 limits this protection provided

it is "without the fault or negligence of the agents or servants of HT&B." It is also interesting to note that in paragraph 8 of the towage agreement, HT&B recognizes that there are instances in which it could be liable and it attempts to protect itself by the limitation statutes of the United States. While I have found no cases dealing specifically with the terms of this contract, providing that the fees are earned at the commencement of the towage service even though the barge is lost, I am cognizant of the cases of *Shebby Dredging Co. v. Smith Bros., Inc.,* 469 F.Supp. 1279 (D.Md.1979); *Mississippi Valley Barge Line Co. v. T. L. James,* 144 F.Supp. 662 (E.D.La.1956); and, *The Anita D.,* 28 F.Supp. 361 (E.D.La.1939). All of these cases involved payment of towage fees and held that they were earned, but in all three cases, it is specifically held that the tower had performed the services agreed to in the contract. While the towage contract in this case does not specifically provide that HT&B will perform the service in a workmanlike manner, it certainly must be held to that standard. See, *Fairmont Shipping Corp. v. Chevron International Oil Co.,* 511 F.2d 1252 (2d Cir. 1975), especially page 1259 under headnotes 2–4. Consequently, Dillingham is not entitled to any compensation under the towage agreement other than the expenses it incurred in transiting the Panama Canal.

10. Todd, in its compromise settlement with Collier, paid $85,000.00 which necessarily reduces by this amount any recovery to which Collier is entitled from Dillingham, Nickum and Spaulding and Salvage Association.

11. The Court further finds that Collier is entitled to interest on its recovery from February 25, 1977, until paid, at the rate of 7½% per annum. *Mobile Towing and Wrecking Co. v. Dredge,* 299 F.Supp. 358.

12. In summary, the Court makes the final allocations of Collier's damage:

| | | |
|---|---|---|
| 1. | Value of the COLUMBIA | $1,901,245.28 |
| 2. | Less deductible | 1,000,000.00 |
| 3. | Less payment by Todd | 85,000.00 |
| 4. | Amount of Judgment | 816,245.28 |

plus interest at the rate of 7½% per annum from February 25, 1977, until paid.

This Judgment is to be allocated among the parties for the following percentages:

| | | |
|---|---|---|
| 1. | Dillingham | 60% |
| 2. | Nickum & Spaulding | 20% |
| 3. | Salvage Association | 20% |

In accordance with the above Findings of Fact and Conclusions of Law, Judgment will be entered.

## JUDGMENT

This cause having come on for final hearing on the pleadings and proof and having been taken under submission, the Court after due deliberation having entered its Findings of Fact and Conclusions of Law, it is ORDERED, ADJUDGED and DECREED that a Judgment in the amount of EIGHT HUNDRED SIXTEEN THOUSAND, TWO HUNDRED FORTY–FIVE AND 28/100 DOLLARS ($816,245.28), be, and hereby is, entered in favor of Defendant-Cross-Claimant, Collier Carbon & Chemical Corporation and against the Plaintiff-Cross-Defendant, Dillingham Tug & Barge Corporation and Third-Party Defendants, Nickum & Spaulding Associates, Inc. and The Salvage Association, Limited, in the following proportions: 60% against Dillingham, 20% each against Nickum & Spaulding and The Salvage Association; this together with interest thereon at the rate of seven and one-half percent (7½%) per annum, from February 25, 1977, until paid.

It is FURTHER ORDERED, ADJUDGED and DECREED that a Judgment in the amount of NINE THOUSAND, SEVEN HUNDRED THIRTY-SEVEN AND 40/100 DOLLARS ($9,737.40) be, and hereby is, entered in favor of plaintiff, Dillingham Tug & Barge Corporation and against defendant, Collier Carbon & Chemical Corporation, together with interest thereon at the rate of seven and one-half percent (7½%) from March 29, 1977, until paid.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 26, 1981, this Court entered a Judgment in favor of the defendant and

third-party plaintiff, Collier Carbon & Chemical Corporation, and against the plaintiff, Dillingham Tug & Barge Corporation and the third-party defendants, Nickum & Spaulding Associates, Inc. and The Salvage Association, Limited, on a proportionate fault basis for $816,245.28. On March 11, 1981, Dillingham filed a motion pursuant to the Federal Rules of Civil Procedure 52(b) and 59(e) to alter or amend the judgment.

Under the aforementioned rules the district court may make supplemental findings and conclusions and may modify the judgment originally entered. *McCraw v. Simpson,* 141 F.2d 789 (10th Cir. 1944); *Reinstine v. Rosenfield,* 111 F.2d 892 (7th Cir. 1940). This Court has reviewed the original findings and conclusions and hereby supplements them where deemed appropriate.

1. Original Finding of Fact 12 is deleted and the following is substituted in lieu thereof:

Because Collier needed the approval of a surveyor designated by the underwriters' policy or of a salvage association in order to obtain insurance on the tow, they contracted with the Salvage Association to perform the insurance approval survey.

2. Original Finding of Fact 18 is deleted and the following is substituted in lieu thereof:

Collier listed the COLUMBIA on Union's fleet policy, which policy had a $1,000,000 deductible. Although HT&B was named an additional insured on the hull and machinery policy ("Hull") with a waiver of subrogation by Union's underwriters, Collier was unable to have HT&B named as an additional insured on its protection and indemnity policy ("P & I"). It is disputed whether Collier advised HT&B of the deductible and of its inability to name HT&B as an additional insured on its P & I policy during a telephone conversation on February 23, 1977, four days before the commencement of the tow. Collier did confirm these facts in a letter dated January 27, 1977, but it is contended by Dillingham that this letter did not arrive until after the commencement of the tow on January 29, 1977.

3. In the original Findings of Fact, there was a failure to mention that Collier was paid $1,000,000 by its underwriters under the Hull policy. This amount represents the value assigned by the insurer above the $1,000,000 deductible.

4. Dillingham contends that it is entitled to recover for towing pursuant to the terms of the contract even if acts or omissions of Dillingham caused or contributed to damage to the barge. For this proposition, Dillingham has cited *Foss Launch & Tug Company v. The Kukui,* 130 F.Supp. 180 (N.D. Cal.1955). This Court is of the opinion that the *Foss* case does not hold as Dillingham wishes it to hold.

The Court finds that its original Conclusion of Law 9 which discussed the towage fee agreement and concluded that Dillingham was not entitled to collect its fee is correct. The Court's original Conclusion of Law 3 addressed this very issue. The Court, finds that the towage agreement was violated due to Dillingham's negligence and that this breach of contract precludes recovery of the towage fee.

5. Dillingham in its motion to alter or amend its judgment, sets out three grounds; namely, that the judgment be amended so as to: (1) hold that Dillingham was a named insured of Collier's hull and machinery insurance policy and therefore no recovery can be had by Collier or its underwriters against Dillingham; (2) hold that Dillingham is entitled to recover in full from Collier the unpaid towage charges and expenses in connection with the towage of the Barge Columbia and; (3) to deny recovery against Dillingham on the cross-complaints of Nickum & Spaulding Associates, Inc. and the Salvage Association, Ltd.

As to the first ground, Dillingham sets out Article 7 of the towage agreement, namely:

7. Collier shall maintain Hull and Machinery and Protection and Indemnity insurance on the Barge to its full value in form and amount satisfactory to HT&B, and such policies shall be endorsed with

waiver of subrogation against HT&B and the tug and shall name HT&B as an additional assured with loss payable to Collier. Collier shall look solely to its Hull and Machinery insurance for the recovery of any loss or damage to the Barge....

Dillingham argues that since Collier had been paid for its loss (minus the self insurance deductible) all of Collier's rights against third-parties pass by subrogation to its insurers and none remained in Collier and that since Collier was reimbursed by its hull and machinery insurance, and that the Court's judgment permits subrogation for an insurer against one of its own named insureds. With this argument, the Court does not agree.

It is undisputed that Collier's insurers waived any claim that they may have ordinarily had against Dillingham. Since Collier's insurers have waived their right to seek subrogation of Collier's claims against Dillingham those rights remain with Collier and are not extinguished simply because Collier has received some compensation for its losses.

6. As to Dillingham's second alleged error, this has been fully covered both in paragraph 4 above and in the Court's original Findings of Fact and Conclusions of Law and requires no further comment.

7. As to Dillingham's third proposition, the cross-complaints of Nickum & Spaulding Associates, Inc. and Salvage Association, Ltd. against Dillingham are without merit as will be further discussed in this memorandum opinion.

8. Collier in motion and brief, alleges that the relationship between Dillingham and its insurers should in nowise limit Collier's right to recover its full loss against Salvage Association and Nickum & Spaulding. It argues that the original Findings and Conclusions should be amended and that a judgment in favor of Collier should be entered jointly and severally against the Salvage Association, Nickum & Spaulding and Dillingham for the full amount of Collier's loss. It contends that

there is a joint tort feasor relationship and that Collier could go against any one of them for the full amount. Collier alleges in its brief, "with respect to Dillingham, the contractual defenses raised against Collier by Dillingham are of no value in defending against the cross-claims for contribution filed by the Salvage Association and Nickum and Spaulding". This argument completely disregards the holding in *U. S. v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251. As stated in *Reliable Transfer, supra,* "we hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, ...." While *Reliable Transfer* uses the phrase "maritime collision or stranding", *Reliable* has been expanded beyond this narrow interpretation. *See, Creole Shipping v. Diamandis Pateras,* 1977 AMC 189, *Navieros Oceanikos . v. Mobile Trader,* 1977 AMC 749; *Hanover Ins. v. Puerto Rico Lighterage Co.,* 553 F.2d 728; *Griffith v. Wheeling Pitt Steel Co.,* 521 F.2d 31; *Hogge v. SS YORKMAR,* 1977 AMC 805, and other cases.

The Second Circuit in the case of *Getty Oil Co., Inc. v. SS Ponce de Leon,* 555 F.2d 328, states on page 333, "We can only conclude that the *Reliable* stands for the proposition that in cases such as this, the district court is obliged to apportion the damages even if one vessel is primarily responsible for the loss and the other is only slightly negligent." I think in the case at bar, *Reliable Transfer,* as far as damages are concerned, is directly on point. It puts this entire matter at rest.

9. *Cooper Stevedoring Co. v. Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 in discussing the question of contribution between tort feasors is dealing with a non-collision maritime case. *Halcyon Lines v. Haenn Ship Corp.,* 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, also dealt with a non-collision maritime situation. Both cases were prior to *U. S. v. Reliable Transfer Co., supra,* which states:

"We hold that when two or more parties having contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault."

In the instant case we are not dealing with a non-collision maritime situation. I think the language in *Reliable* is perfectly plain. This is a maritime collision case. The Court has found the proportionate fault of each and this is the extent of their liability. *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246, 1249 (5th Cir. 1979).

 I am of the opinion the doctrine of contribution among joint tort feasors does not apply in a maritime collision case. I think it is an exception from that doctrine. I can find no case that specifically says this, but all the maritime cases I have found that apply the doctrine are non-collision cases. *See,* footnote 5 in *Cooper, supra,* page 111, 94 S.Ct. page 2177.

10. Collier, in its motion, contends that the collateral source rule applies as between Collier and Dillingham and that Collier is entitled to its full loss against Dillingham, even though it has collected a million dollars from its insurance carrier. The Court recognizes the collateral source rule, but the fallacy of Collier's contention is the fact that its recovery against Dillingham is limited. Collier agreed to insure the barge for full value. Had Collier done this, it would have collected the full value of the barge from the insurance company and the insurance company would have subrogated, had it not waived its subrogation rights. Collier breached its contract with Dillingham in that it did not insure the barge for full value, as the policy had a million dollar deductible feature. Collier's breach of its contract with Dillingham certainly prevents it from a windfall recovery against Dillingham.[1]

11. Dillingham argues that there is no joint tort feasor relationship between themselves, Collier and Salvage. With this I do not agree. I think *Reliable Transfer* clearly has in mind joint tort feasors. But in a maritime collision or stranding, or a situation such as exists in this case, liability for damage is to be allocated among the parties proportionately to the comparative degree of their fault. This, the Court has done.

12. The Court's Findings of Fact and Conclusions of Law is AMENDED in accordance herewith and in all other respects remains in full force and effect. The Judgment of February 26, 1981, remains in full force and effect, but is AMENDED to become effective as of the date of the filing of this Supplemental Findings of Fact and Conclusions of Law.

---

1. *Sessions v. Kopke, et al,* 479 F.2d 1041 (1973).